**STATE of Missouri, Respondent,**

v.

**John Charles HAYES, Appellant.**

**No. 23030.**

Missouri Court of Appeals,
Southern District,
Division Two.

April 27, 2000.

---

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT S. BARNEY, Judge.

John C. Hayes ("Defendant") appeals his conviction and sentence after a jury trial arising from a charge of Murder in the Second Degree of Stacy Lynn Charrier, a.k.a. Stacy Lynn Fowler ("Stacy") [1]; *see* section 565.021.1, RSMo 1986.[2] In its judgment, the trial court imposed a sentence of life imprisonment. Defendant appeals, raising two points of trial court error. We affirm.

1. We refer to Ms. Fowler by her forename for ease of use only. No disrespect is intended.

2. This case arose in Stone County but was transferred to Newton County on May 1, 1998, pursuant to the grant of Defendant's application for change of venue.

Defendant challenges the sufficiency of the evidence supporting his conviction. "When reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Robinson*, 982 S.W.2d 747, 748 (Mo.App.1998). "Upon review, all evidence favorable to the state is accepted as true, which includes favorable inferences adduced by the evidence; all evidence and inferences to the contrary are disregarded." *Id.* "A jury may believe or disbelieve all, part, or none of the testimony of any witness." *Id.* "Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt." *State v. Myszka*, 963 S.W.2d 19, 23 (Mo.App.1998). "All of the elements of a homicide case, including the corpus delicti may be proved with circumstantial evidence." *Id.* The "jury resolves questions of credibility and inconsistencies in the evidence." *State v. Neely*, 979 S.W.2d 552, 561 (Mo.App.1998).

Viewed in the light most favorable to the verdict, the adduced evidence shows that Stacy graduated from Central High School in 1989. In the fall following graduation, she moved in with a friend, Carolyn Shelton, and Shelton's three children. Stacy met Defendant through Ms. Shelton and began dating Defendant. Defendant eventually moved into the house with Stacy, Ms. Shelton and Shelton's children.

There was evidence presented that Defendant was possessive of Stacy. On June 25, 1990, Stacy and Defendant argued in the living room of the Shelton house. The argument concerned Stacy's desire to end the relationship. Ms. Shelton admonished the couple not to argue "in front of the ...

children." Stacy, Ms. Shelton and one of Ms. Shelton's daughters moved to the front porch. Ms. Shelton testified that Defendant then came "flying" through the front window, that "[h]e was very angry," and that he had "his hands outstretched like he was trying to get to Stacy." She further testified that "[h]e started [to] threaten that he was going to kill himself," that she had called the police, and that she "had taken Stacy and the kids down to a friend's house...."

Officer Dennis Shook of the Springfield Police Department testified that he had responded to a call concerning a suicide in progress at the Shelton house. When he arrived, he was told by "a female standing there" that Defendant was upstairs and that he had cut his wrists. Officer Shook found Defendant sitting on the floor in an upstairs closet with the lights out. Defendant was angry and uncooperative with the officer, refused to let the officer see his wrists, stated that his girlfriend had broken up with him and he no longer wanted to live, that he wanted to be left alone. Defendant eventually exited the room and went downstairs with the officer following. Defendant then attempted to leave. Officer Shook stated that the Defendant's wrists were cut to the point that he could see "muscles and tendons and stuff like that" and that Defendant became even more angry and combative when he was not allowed to leave, to the point of resisting the officers attempts to help him and throwing Officer Shook to the ground and wrestling with him. Defendant was finally transported to a hospital.

Following that incident, Stacy and Defendant reconciled for a period of time. Defendant eventually moved back in with Stacy and the Sheltons at a different house.[3] At trial, Ms. Shelton testified that Stacy again decided to break off the relationship with Defendant. As best this Court can discern from the record, on July

---

**3.** Ms. Shelton testified that she was evicted from the previous house after Defendant jumped through the window.

21, 1990, Ms. Shelton took Stacy over to the house of the man Ms. Shelton was dating at the time. Ms. Shelton then returned to her house and told Defendant to move out. She indicated that Stacy would not be going with him and Defendant got "very mad and very angry." Ms. Shelton testified that Stacy had found out previous to that evening that she was pregnant with Defendant's child and when Ms. Shelton told Defendant to move out he said that "if we thought that he was just going to stand by and let some other man's d____ be poking his baby's head that we were wrong." Defendant gathered his things and left and Ms. Shelton returned to her boyfriend's house. Ms. Shelton testified that she last saw Stacy alive when Stacy departed her friend's home for a walk later that night.

Ms. Shelton also stated that she became worried about Stacy when Stacy did not return home that night. She filed a missing person report with the police and searched for Stacy at various locations. The day after Stacy's disappearance, Defendant gave a note to Ms. Shelton that he claimed Stacy had written and asked him to give her. Ms. Shelton testified the note was not in Stacy's handwriting. A couple of days later, Defendant showed Stacy's mother a letter he claimed Stacy had written which stated that Stacy loved Defendant, that she was having his baby, and that she "did not want the Fowlers invited to the wedding." Stacy's mother testified that the letter she saw was also not in Stacy's handwriting.

William Moore testified that he worked with Defendant at the time of Stacy's disappearance. He testified that he and Defendant went to a bar for a drink after work shortly after Stacy's disappearance. At the bar, Defendant asked Mr. Moore "how to live if you killed somebody." Defendant then told Mr. Moore "that he got mad at his girlfriend and strangled her and threw her in a cave behind a rock." Mr. Moore testified that in the following weeks Defendant had joked that "he couldn't be charged if you can't find a body" and had further told Mr. Moore that he "went back to look at the body and it was yellow."

Greg Joiner, a friend of Defendant, testified that about a month or so after Defendant told him that Defendant and Stacy had broken up, he was out driving around with Defendant "having a few beers." At some point during the drive, Defendant told Mr. Joiner that "he caught Stacy with a nigger and that he killed her and that he had put her in the cave behind his dad's house." Further, Mr. Joiner testified that a few years later, after Defendant had married, that Defendant had a child that died at birth. Mr. Joiner testified that Defendant had told him at the time of the child's death that he "wanted to have a child, have a boy to keep the Hayes' tradition or name going" because he "didn't know when he was going to get caught and go to jail for" killing Stacy.

Rhonda Hagar testified that she dated Defendant for approximately two weeks in August of 1990, about a month after Stacy disappeared. Ms. Hagar was a dancer in a strip bar and testified that the first night she met Defendant he told her that he was upset because his pregnant girlfriend "Stacy" had left him and was going to Texas and he had tried to repair things with her but she had refused his entreaties. Ms. Hagar further testified that Defendant was possessive of her after they started dating; didn't like her going places without him; came to the strip bar almost every night; and got very upset when other men would tip her. Ms. Hagar eventually broke off her relationship with Defendant after she wanted to go home one night and Defendant did not want her to. She testified he "got very upset, started screaming and hollering" and started threatening her by saying, more than once, that she "could end up like his last girlfriend."

On January 1, 1998, Christopher Genovese, a sixteen year-old boy, and a friend, Eric Willoughby, were out exploring an area near the intersection of Joe Bald road and Peninsula Estates road near

Kimberling City in Stone County. Christopher had found three sinkholes some time previously and the boys had decided to explore them. They had brought along a flashlight and some rope. They entered the largest of the sinkholes which was three to four feet wide at the top and eight or nine feet deep with "rock forms on the walls on one side and the other side ... just layered rock, real thin layered rock." At the bottom of this sinkhole was a rock ledge, and when the boys looked *under* the ledge they saw what they thought was a round "geode rock." Christopher tried to reach it but it was too far back under the ledge to reach by hand so he and his friend found a forked stick. When Christopher used the stick to flip the object over he saw that it was a human skull. The boys took the skull home and law enforcement officials were notified of their finding.

An investigation and excavation recovered other skeletal remains wrapped in a blue electric blanket as well as a Big Red chewing gum wrapper, a blue zippered vinyl bag, a hair brush, a bottle of Almay makeup, blue mascara, and a pair of tennis shoes (one shoe size seven and the other size seven and a half)[4] with blue and white laces on each side. The tennis shoes were tied together. Further, a Central High School class ring from the graduating class of 1989 was found with the initials S.L.F. engraved inside the band. A number of other items were found as well. Witnesses testified that all of the items were either items belonging to Stacy, were almost identical to items Stacy owned, or were products that Stacy used and carried with her.[5] An anthropologist presented testimony that the remains were those of a female, probably Caucasian, in her late teens or early twenties.

After Stacy's body was found, investigators contacted Defendant to question him. Defendant was told that some remains had been found and that the investigators wanted to talk to him about one of the missing persons whose remains they may have found. Defendant, appearing nervous and fidgety, immediately stated that he did not kill Stacy, even though the investigators had not yet mentioned her name. Over the course of a number of interviews Defendant gave conflicting stories concerning when and where he had last seen Stacy, finally stating that "what actually happened" was that he came home one night and Stacy was gone and that he never saw her again. Defendant also informed the investigators that his father owned a cabin near the Joe Bald Recreation area in Stone County. According to trial testimony, the sinkhole where Stacy's body was found was located within 100 to 400 yards of Defendant's father's cabin. Mr. Joiner also testified that he had been to the sinkhole with Defendant a number of times. Mr. Moore and Mr. Joiner both came forward with the information previously mentioned when they heard that a body had been discovered. Mr. Joiner further testified that he had gone out to the sinkhole at one point to see if Defendant had been telling him the truth but that he had not actually gone down in the sinkhole and did not see anything unusual from the rim.

## I.

In his first point on appeal, Defendant claims that the trial court plainly erred in admitting the evidence of the Defendant's attempt to commit suicide and the subsequent encounter with the police because the admission "deprived [Defendant] of his rights to due process" in that "any proba-

---

4. Testimony was presented that Stacy's feet were different sizes and she always wore mismatched sized shoes.

5. A can of Skoal tobacco was also found. Testimony indicated that Defendant used Skoal tobacco at the time of Stacy's disap-

pearance. There was also testimony presented that Defendant and Stacy had exchanged high school rings and that Defendant, therefore, was in possession (at the time of the disappearance) of the ring that was found with the body.

tive value" of this evidence "was clearly outweighed by its prejudicial impact." Defendant admits that the admission of this evidence was not properly objected to and asks that we review for plain error in that "[i]f left uncorrected, manifest injustice will result."

█ Under Rule 30.20, Missouri Court Rules (2000), we may review contentions of error not properly preserved for "plain errors affecting substantial rights" and may consider such error if we find "that manifest injustice or miscarriage of justice has resulted therefrom." "An assertion of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Mitchell,* 975 S.W.2d 191, 199 (Mo.App.1998). "A defendant must not only show prejudicial error occurred, but must also show that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error is left uncorrected." *Id.*

█ "The trial court is vested with broad discretion respecting the relevance and admissibility of evidence." *State v. Coleman,* 949 S.W.2d 137, 147 (Mo.App. 1997). " 'There must be a clear showing of an abuse of discretion for an appellate court to interfere with a trial court's ruling on the admissibility of evidence.' " *Neely,* 979 S.W.2d at 561 (quoting *State v. Bowens,* 964 S.W.2d 232, 237 (Mo.App.1998)). "The trial court is given discretion 'because of concerns about prejudice, confusion of the issues, and interrogation that is only marginally relevant.' " *Id.*

█ "As a general rule, evidence of prior uncharged crimes and prior bad acts are (sic) inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Cosby,* 976 S.W.2d 464, 468 (Mo.App.1998). "However, evidence of prior bad acts is admissible if it is both legally and logically relevant."

*Id.* "For evidence to be considered legally relevant, its prejudicial effect must be outweighed by its probative value." *State v. Dudley,* 912 S.W.2d 525, 528 (Mo.App. 1995). Evidence is logically relevant "if it has some legitimate tendency to establish the defendant is guilty of the offense for which he is on trial." *State v. Fouts,* 939 S.W.2d 506, 513 (Mo.App.1997). Generally, evidence of other, uncharged misconduct has a legitimate tendency to prove the specific crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or identity of the person charged with the commission of the crime on trial. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993); *State v. Sladek,* 835 S.W.2d 308, 311 (Mo. banc 1992).

█ Here, Defendant complains that the evidence of his attempted suicide and subsequent scuffle with the police was not legally relevant.[6] The State claims that "the challenged evidence … was relevant to show [Defendant's] motive to kill Stacy." The State's theory is that Defendant's reaction to Stacy's first attempt at breaking up with Defendant is relevant to show Defendant's possessiveness and to show "the lengths to which [Defendant] would go to keep [Stacy] in the relationship." We agree. The evidence that Defendant had tried to hurt himself inferentially reflects the extreme agitation Defendant experienced when confronted by the prospect of Stacy leaving him. It certainly lends strength to the State's argument that when confronted by that prospect a second time, Defendant's obsession with Stacy led to her homicide. Such probative evidence is not outweighed by any prejudice the jury might have against suicidal persons, or even suicidal persons who must be physi-

---

6. Defendant does not complain of the evidence presented at trial showing that Defendant had jumped through the front window of Ms. Shelton's house in an apparent attempt to "get at" Stacy.

cally restrained by law enforcement in order to be helped. The trial court did not abuse its discretion in determining the probative value of the evidence relating to Defendant's ostensible suicide attempt outweighed its prejudicial effect. *Fouts*, 939 S.W.2d at 513. Even assuming *arguendo* that such evidence was more prejudicial than probative, when considering the other evidence presented at trial, particularly Defendant's multiple inculpatory statements, the admission of such evidence would certainly not result in manifest injustice or a miscarriage of justice. *See State v. Stallings*, 957 S.W.2d 383, 389 (Mo.App.1997); Rule 30.20, Missouri Court Rules (2000). Defendant's first point is denied.

## II.

In his second point on appeal, Defendant argues that "the state failed to prove that Stacy ... died as the result of a homicide rather than an accident or suicide without reference to [Defendant's] statements, which were inadmissible for that purpose, since the corpus deliciti had not been established." We interpret Defendant's second point as a claim that the extra-judicial admissions of Defendant were improperly admitted without independent proof of the *corpus delicti*. This claim is meritless.

 "As a general rule '[e]xtrajudicial admissions, statements or confessions of the accused are not admissible in evidence absent independent proof, either circumstantial or direct, of the essential elements of the corpus delicti.'" *State v. Evans*, 992 S.W.2d 275, 284 (Mo.App.1999) (quoting *State v. Friesen*, 725 S.W.2d 638, 639 (Mo.App.1987)).

> The *corpus delicti* in a homicide case consists of two elements—(1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death. The State must prove that the death was

neither self-inflicted nor the result of natural causes or accident.... The corpus delicti cannot be presumed and must be proved by legal evidence sufficient to show that the specific crime charged has actually been committed by someone. However, proof of the corpus delicti need not include proof of defendant's connection with the crime charged.

*Id.* (citations omitted). However, "[o]nly slight corroborating facts are sufficient to establish the corpus delicti." *Id.* at 285. "Evidence of the *corpus delicti* need not precede a defendant's admission so long as the essential elements of the crime are proved by the end of the trial." *Id.* " 'Proof of the *corpus delicti* and [an] admission can be considered together and the sum of the two can go to prove the essential elements of the crime.' " *Id.* (quoting *State v. Frentzel*, 730 S.W.2d 554, 558 (Mo.App.1987)).

 In the instant matter, Stacy disappeared suddenly. There was evidence presented that Stacy was healthy and happy and had no connection to the area where her body was found except through Defendant.[7] Stacy had no driver's license. However, the sinkhole where she was found is approximately one hour's drive from Springfield, Missouri, under normal driving conditions. Evidence was presented that her body was found *underneath* a stone outcropping at the bottom of the sinkhole. Her shoes were found tied together. Her body was wrapped in an electric blanket. Such evidence surpasses the "slight corroborating facts" needed to establish that the death was not the result of accident, suicide or natural causes, thereby allowing Defendant's inculpatory statements to be admitted. *See Id.*

Defendant's second point is denied.

The judgment of the trial court is affirmed.

---

7. Recall that Defendant's father's cabin is located some 100 to 400 yards from where Stacy's remains were found.

787

GARRISON, P.J., concurs.

PREWITT, J., concurs.