STATE of Missouri, Respondent,

v.

Larry R. HATCH, Appellant.

No. WD 58313.

Missouri Court of Appeals, Western District.

July 3, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 2001.

Application for Transfer Denied Oct. 23, 2001.

Susan L. Hogan, Esq., Kansas City, for Appellant.

John Morris, III, Jefferson City, for Respondent.

Before LOWENSTEIN, P.J., ULRICH and HANNA, JJ.

LOWENSTEIN, Judge.

Appellant, Larry Hatch, was convicted after a jury trial of one count of assault in the second degree, § 565.060, RSMo 2000,[1] and one count of assault in the third degree, § 565.070. The jury acquitted Hatch of one count of forcible sodomy, § 566.060. Hatch was sentenced as a prior and persistent offender to concurrent terms of twenty year's imprisonment in the Missouri Department of Corrections for assault in the second degree, and one year in the Jackson County jail for assault in the third degree.

Hatch does not contest the sufficiency of the evidence. His three points on appeal are as follows: 1) the trial court abused its discretion in removing him from the courtroom for the entire afternoon of the first day of the State's evidence; 2) the trial court plainly erred in overruling defense counsel's request for a mistrial after the State learned that some of the jurors may have witnessed an altercation between him and correctional officers in the courthouse during a lunch recess; and 3) the trial court erred in allowing the victim to testify that he made her engage in sexual activity with him and another woman.

The judgment of the trial court is affirmed.

*Factual and Procedural History*

Hatch does not challenge the sufficiency of the evidence. The evidence is viewed in

the light most favorable to the jury's verdict. *State v. Neal,* 14 S.W.3d 236, 241 (Mo.App.2000). Donzella Draper met Hatch in February of 1998 and they started dating. On March 5, 1998, Draper went to visit Hatch at his house located at 3025 Mersington. Hatch's brother Curtis also lived at the house. When Hatch told Draper he had to go somewhere, she stayed at the house with Curtis. Draper and Curtis began smoking crack cocaine in the living room. When Hatch returned, approximately thirty minutes later, he was angry. He started yelling at Draper and demanding that she tell him where she got the drugs. Curtis tried to calm Hatch down but he left after Hatch accused Draper of sucking Curtis's penis in exchange for the crack cocaine. Hatch began yelling at Draper and hitting her in the head and face.

Very late the same evening, Curtis approached two police officers and told them that a woman had been beaten unconscious at 3025 Mersington. The officers went to the house and knocked on the door but there was no answer. The officers left after looking through the windows since the house seemed secure. The next afternoon, the officers were dispatched to the station where Curtis informed them again that a woman had been beaten and was unconscious at 3025 Mersington. Curtis told them he lived at that address. When they arrived at the house, Curtis kicked the door open. One of the officers called out and Hatch responded, "Who the fuck is it?" The officer asked whether anyone else was in the home and Hatch said no. When the officer stepped into the living room, he found Draper lying on the floor

---

**1.** All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

wrapped in a blanket. Draper's face was swollen, her eyes were swollen completely shut and she had blood coming from her mouth. Hatch ran from the officers and was arrested five blocks from his house.

Draper did not remember what happened to her after she was beaten by Hatch. She spent approximately five months in the hospital due to her injuries. Draper suffered from multiple bruises, bleeding under the skin of her face, left chest, arms and legs, a dislocated finger, a subdural hematoma, a collapsed left lung, some broken ribs, and a fractured cheekbone. Due to her injuries, Draper had no memory and had to relearn how to walk.

In August of 1998, an unidentified woman took Draper to Hatch's house on Mersington to get some crack cocaine. Draper did not remember the house and did not remember what happened there until Hatch opened the door. Draper was afraid to turn around and leave because she thought he would think that she was going to testify against him. Draper stayed at the house with Hatch until September 28, 1998. During this time, Hatch continually beat her, punching and kicking her and burning her feet with cigarettes.

Hatch, a muslim, would sometimes take Draper to a mosque for services. If Draper looked at anyone he would beat her for punishment. Hatch married Draper, against her will, under the Moslem religion sometime in September of 1998.

Hatch also had women come to the house. Between four and eight times, Hatch forced Draper to have sex with him and another woman and he would beat her if she refused. On several occasions, Hatch put a wooden gardening hoe handle into Draper's vagina and made her simulate sexual intercourse.

On September 28, 1998, in the early evening, a police officer was dispatched to 3025 Mersington to investigate a suspicious party. Other officers were already at the scene and had detained Hatch as a suspect in another crime. One of the officers conducted a sweep of the residence and found Draper sitting on a couch wearing sunglasses and a stocking cap. When the officer asked her to stand up she was unresponsive. Draper's face, eyes and lips were so swollen her facial features were almost indistinguishable; she had bruising on her side, a large, open sore on her buttocks, a laceration on her back, and she had trouble walking. Draper was taken to a hospital by ambulance.

Stemming from both the March 5, 1998, and September 28, 1998, incidents, Hatch was charged as a prior and persistent offender with one count of assault in the first degree, § 565.050, two counts of assault in the third degree, § 565.070 and one count of forcible sodomy, § 566.060. Hatch's trial was held in December of 1999. Prior to voir dire, the State dismissed one count of assault in the third degree. At the time of trial, Draper had no vision on her right side, she was numb on the left side of her body, had problems with her memory and problems breathing due to her collapsed lung.

The jury acquitted Hatch of the forcible sodomy charge but convicted him of one count of assault in the third degree, and one count of assault in the second degree.[2] Hatch was sentenced as a prior and persistent offender to concurrent terms of twenty years' imprisonment in the Missouri Department of Corrections for assault in the second degree and one year in the Jackson County jail for assault in the third degree. Hatch appeals.

---

2. Hatch was convicted of second degree as- sault on the first degree assault charge.

## I.

Hatch argues in his first point that the trial court abused its discretion in removing him from the courtroom for the entire afternoon of the first day of the State's evidence because it violated his right to be present during the trial, his right to confrontation, his right to a fair trial and his right to due process. Hatch claims that he had not indicated any intention to disrupt the proceedings nor did he act in a disruptive or disorderly manner while in the courtroom and that in fact, the incidents for which he was excluded occurred outside the courtroom.

"A defendant in a criminal trial has the constitutional right to be present in the courtroom during every stage of the trial." *State v. Solomon*, 7 S.W.3d 421, 426 (Mo.App.1999) (citing *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). A defendant can lose this right if he "insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343, 90 S.Ct. 1057.

The trial court is charged with the obligation of maintaining an orderly procedure in the courtroom and is given the discretion to determine what constitutes a disruption and what action to take when confronted with a disorderly defendant. *State v. Bowens*, 964 S.W.2d 232, 239 (Mo.App.1998). "A discretionary ruling is presumed correct and the burden of demonstrating abuse is cast on the party appealing." *Id.* To establish an abuse of discretion, "a defendant must show that reasonable persons would not differ as to the propriety of the actions taken by the trial court." *Id.*

In this case, a culmination of events resulted in Hatch's removal from the courtroom during the afternoon of the first day of trial. During pre-trial motions, Hatch continually interjected comments and questions to the trial court, complained he was not receiving justice and was irritated because the trial court denied him a continuance. After a recess, the pre-trial hearings continued and the trial judge expressed his concern about Hatch's behavior. The trial judge told Hatch that he wanted to come to an understanding with him about the behavior expected of him during the trial. The trial judge noted that he understood Hatch was frustrated and agitated by rulings he had made on various motions, but that during the trial, order needed to be maintained in the courtroom. The trial judge also told Hatch that he would not allow any misconduct or talking out of turn in the courtroom and that if Hatch did so, the trial court had the option of removing him from the courtroom. Hatch made a lengthy Statement to the court and agreed to cooperate. After conducting voir dire, the court recessed for the evening.

The following morning, a hearing was held outside the presence of the jury in which the trial judge informed counsel that he had received a phone call from the jail that morning concerning Hatch. An officer from the jail told the judge that there would be a delay in bringing Hatch to the courthouse because he had refused to leave the jail with the two guards assigned to him. Hatch became angry with the guards and attempted to hit them, resulting in Hatch being restrained. The trial court ruled that Hatch's hands would remain shackled during the trial based on his continuing difficulty to get along with his trial counsel, his agitated demeanor in other proceedings, the trial court's difficulty controlling him in the courtroom, and the incident in the jail. Hatch promised the trial court that he would behave. The

following colloquy is a sample of the dialogue between Hatch and the trial court:

Hatch: Well, you do what you got to do, because I'm not scared of you or no procedure, processes you can put me through, trust me.

The Court: Okay. Well, are you telling me that you're not going to cooperate with me, then, Mr. Hatch?

Hatch: No, I'm not telling. I told you I was going to cooperate, but you keep making those statements like you're going to make me get up under this table. I'm saying you cannot, Your Honor, threaten me to not be to feel what I feel in the position I'm in.

The Court: But you see, Mr. Hatch, that's exactly—

Hatch: I'm not scared of that.

The Court: But you see, Mr. Hatch, I interpret what you're doing is an attempt to intimidate me and intimidate the system.

Hatch: That's not what I'm trying to do.

The Court: Well, it may not be what your trying to do, but that's certainly the impression that I'm getting.

After a brief recess the trial began. Appellant's hands were shackled. Following opening statements and some testimony, the court recessed for lunch. After the lunch recess, the trial court held a hearing outside the presence of the jury and Hatch. The trial court informed counsel that during the recess, Hatch had become violent with his jail guards. The jail guards testified regarding both the morning incident and the afternoon incident. The officers testified that after the noon recess, before Hatch was led out of the courtroom, he became agitated with his attorney for the way his attorney was handling things. The guards took Hatch into the witness room for the lunch hour. He continued to complain about his attorney, called the guards "honky motherfuckers," and told them that they should not be able to judge him. The guards began ignoring Hatch. While in full restraints, Hatch reached forward, stood up from the table he was sitting at, and pushed it over on top of one of the guards, spilling food everywhere. The guards restrained him against the wall and called the sheriff's deputies. The sheriff's deputies told Hatch that his behavior was not going to be tolerated and that they would take him out of the courtroom if necessary. Hatch sat and behaved for a short time and then got agitated again and started struggling with the guards. The sheriff's deputies returned and restrained Hatch and decided he should be removed from the courthouse. Hatch started struggling again in the hallway, requiring at least three officers to physically carry him into the elevator.

Following the testimony of the guards, the trial court ordered Hatch barred from the courtroom for that afternoon. The trial court stated it was open to the idea of Hatch returning to court the next day if he would cooperate and behave. Hatch was allowed to return to court the next morning in hand shackles.

Hatch attempts to distinguish his case from those in which other defendants were engaged in disruptive behavior by arguing that he did not engage in any disruptive behavior *inside the courtroom* and did not disrupt the actual trial. It is apparent from the record that Hatch engaged in a pattern of disruptive behavior. He continually made outbursts at pretrial proceedings, disrespected and attempted to intimidate the trial judge and attacked jail guards both verbally and physically. These events occurred after Hatch assured the trial court that he would behave properly. The record also shows that Hatch was given several chances by the trial

court but refused to act in an appropriate manner.

■ "An accused cannot claim the benefit of constitutional rights while at the same time engaging in disruptive conduct that makes it exceedingly difficult to carry on a trial." *Bowens,* 964 S.W.2d at 239. Hatch acted disorderly and thereby lost his right to be present for that afternoon. *Allen,* 397 U.S. at 343, 90 S.Ct. 1057. The trial court did not abuse its discretion in removing Hatch from the courtroom during the first afternoon of the trial. The trial court gave Hatch several chances to act appropriately before resorting to his removal from the courtroom. "An accused person, placed upon trial and protected by constitutional and statutory safeguards, cannot be allowed to defy the processes of the law, paralyze the proceedings, and turn them into a farce, taking advantage of his own wrong." *Bowens,* 964 S.W.2d at 240. "In light of appellant's contumacious conduct, the court did not err in barring him from the courtroom because his behavior violated the dignity, order, and decorum of the court, threatened to impede the proceedings, and created the likelihood of prejudice against him." *State v. Bolder,* 635 S.W.2d 673, 687 (Mo. banc 1982); *Scurr v. Moore,* 647 F.2d 854, 858 (8th Cir.1981). This point is denied.

## II.

■ In his first point, Hatch implied he should not have been removed from the courtroom since his conduct did not occur in front of the jury. In his second point, Hatch argues that the trial court plainly erred in denying his request for a mistrial after the State learned that some of the jurors may have witnessed the altercation he had with the correctional officers and sheriff's deputies in the courthouse hallway.

After the lunch recess altercation discussed *supra* in point I, the trial court informed counsel of the following:

The Court: Well, basically, couple of people from Division 11 said that it was so crazy that it's conceivable that some of the jurors were going in and out. It's not like they saw that it happened, it's just that it's conceivable that it did happen.

My proposal is this, is that, candidly, my first thought is, if they did, it as another example of problems that are Mr. Hatch's making. Secondarily, whatever problem it creates, whether we proceed now or later really is of no moment. If we need to make an inquiry, we can make an inquiry at a later date, is what I'm saying. Think we ought to get back and start hearing evidence, and then if you all can think of a creative way to make an inquiry, I'd consider doing it. But I'm listening to any suggestion you got.

■ Hatch's trial counsel declined the trial court's offer to make an inquiry of the jury regarding the altercation. Hatch's counsel thought that if the trial judge asked questions about an altercation combined with Hatch's absence from the courtroom, the jurors would likely draw the conclusion that Hatch had been involved in an altercation. Instead, Hatch's trial counsel moved for a mistrial which was denied by the trial court. Hatch failed, however, to include this issue in his motion for new trial. Thus, this court will only review for plain error. *State v. Smart,* 907 S.W.2d 275, 278 (Mo.App.1995).

■ The declaration of a mistrial is a drastic remedy that will only be granted in extraordinary circumstances in which it is the only way to remove prejudice to the defendant. *State v. Vaught,* 34 S.W.3d 293, 295 (Mo.App.2000). The decision to grant a mistrial is within the trial court's

discretion "because the trial court is in the best position to observe the impact of the 'problematic incident.'" *Solomon*, 7 S.W.3d at 426. Thus, appellate review is limited to a determination of whether the trial court abused its discretion. *Id.* Hatch asks this court to review the trial court's denial of his request for a mistrial for plain error. "Rule 30.20 authorizes us to consider errors which are 'plain' if they affect substantial rights. An error is plain if, on its fact, we discern substantial grounds for believing that the error caused manifest injustice or a miscarriage of justice." *Vaught*, 34 S.W.3d at 295.

Here, Hatch's request for a mistrial was a result of his own misconduct. Allowing Hatch a mistrial "would be an open invitation to any defendant to engage in similar conduct and thereby prevent his trial from reaching a conclusion, and it would place a premium on a defendant's own misconduct." *State v. McGinnis*, 441 S.W.2d 715, 718 (Mo. banc 1969). Furthermore, Hatch has failed to provide evidence that any of the jurors observed the altercation in the hallway. The trial court offered to question the jury about the incident and offered to make a curative instruction, both of which Hatch declined. The trial court's denial of Hatch's request for a mistrial did not amount to plain error. Point II is denied.

### III.

Hatch argues in his third point that the trial court erred in allowing Draper to testify that he made her engage in sexual activity with him and another woman in that such evidence was irrelevant and inadmissible evidence of other crimes or bad acts and that the probative value of such evidence did not outweigh its prejudicial effect.

The trial court has broad discretion with regard to the relevance and admissibility of evidence. *State v. Hayes*, 15 S.W.3d 779, 785 (Mo.App.2000). For an appellate court to interfere with a trial court's ruling on the admissibility of evidence there must be a clear showing of an abuse of discretion. *Id.*

"As a general rule, evidence of prior uncharged crimes and prior bad acts are inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Cosby*, 976 S.W.2d 464, 468 (Mo.App.1998). Evidence of bad acts, however, is admissible if it is both legally and logically relevant. *Id.* In order for evidence to be considered legally relevant, its prejudicial effect must be outweighed by its probative value. *State v. Dudley*, 912 S.W.2d 525, 528 (Mo.App. 1995). Evidence is logically relevant "if it has some legitimate tendency to establish the defendant is guilty of the offense for which he is on trial." *State v. Fouts*, 939 S.W.2d 506, 513 (Mo.App.1997).

Generally, evidence of uncharged misconduct is admissible to show 1) motive; 2) intent; 3) the absence of mistake or accident; 4) a common plan or scheme embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or 5) the identity of the person charged. *Hayes*, 15 S.W.3d at 785. Uncharged crimes have also been admissible when they are part of the circumstances or the sequence of events surrounding the offense charged. *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). The evidence is admissible to "present a complete and coherent picture of the events that transpired." *State v. Williams*, 976 S.W.2d 1, 4 (Mo.App.1998) (quoting *State v. Skillicorn*, 944 S.W.2d 877, 886–87 (Mo. banc 1997)).

Draper's testimony that Hatch made her engage in sexual activity with him and

another woman was properly admitted by the trial court. Draper testified that Hatch forced her to perform sexual acts with him and another woman between four and eight times during August and September of 1998. The basis of two of the counts against Hatch stemmed from events that transpired during the same time period. Hatch was charged with third degree assault for repeatedly beating, kicking and burning Draper with a cigarette between or on or about August 28, 1998 to September 28, 1998, and for forcible sodomy on or about September 28, 1998, for inserting a wooden handle of a garden hoe into Draper's vagina. Draper's testimony that Hatch forced her to have sex with him and another woman presents a complete and coherent picture of the events that transpired. Draper testified on direct examination as follows:

Q: Ms. Draper, you started to tell us about this other woman would you please tell the jury what would happen with her?

A: I was made to have sexual intercourse with her and Larry at the same time.

Q: What exactly were you forced to do?

A: The two girls would get on top of each other and then sometimes one of us would have to suck his [penis] while the other one was supposed to [perform oral sex on] the other girl.

Q: How many times—did you want to do this?

A: No.

Q: Did you tell Larry that you didn't want to do anything with this woman?

A: Sometimes I told him, but when I did tell him, I would get beat up, because he assumed that I liked it and I wanted to do that. And I told

him that I didn't like it. I didn't want to do it.

Q: What, if anything, would happen if you told him you didn't want to do it?

A: I would only tell him during that conversation, and I found out when I told him that he assumed I liked it. And when I said I didn't, I would get beat up.

Q: How many times were you forced to have sexual relations with another woman during this time from August to September?

A: About four to maybe eight times. Something in between there.

Q: During this time period, did the defendant do anything else to you?

A: Yes. He did other sex stuff.

Q: When you say he did other sex stuff, what exactly did he do?

A: He took a garden hoe with the metal part that's on the end, and he would push the pole part in my vagina, and then he would make me—he would prop it up against the wall, the metal part, and put the end in me from behind and make me grind on that thing while I had to suck his [penis] or he would just sit there and watch it.

Draper's testimony was legally relevant in that its probative value outweighed its prejudicial effect because it showed that some of her beatings were the result of her telling Hatch that she did not want to engage in sexual activity with him and another woman. Furthermore, Hatch's acquittal of the forcible sodomy charge shows that the jury was not prejudiced by Draper's testimony. Draper's testimony was also logically relevant in that it helped to establish a coherent picture of the sequence of events surrounding the offenses Hatch was charged with. Therefore, the

trial court did not abuse its discretion in admitting Draper's testimony. This point is denied.

The judgment of the trial court is affirmed.

All concur.