STATE of Missouri, Plaintiff–
Respondent,

v.

Michael BELL, Defendant–Appellant.

No. 23909.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 31, 2001.

Motion for Rehearing and Transfer Denied
Jan. 18, 2002.

Application for Transfer Denied
Feb. 26, 2002.

Nancy L. Vincent, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stephanie Morrell, Asst. Attorney General, Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

Michael Bell ("Defendant") appeals his jury conviction for first-degree robbery (§ 560.020), for which he was sentenced to fifteen years' imprisonment.[1] In four points relied on, Defendant charges the trial court committed reversible error when it refused to (1) dismiss the charges because of the State's delay in filing them, (2) give Defendant relief on his speedy trial request, (3) grant a mistrial when a witness alluded to Defendant's prior bad conduct or involvement in other crimes, and (4) allow evidence about why the State dismissed charges against another participant in the subject crimes. For the reasons outlined below, all points are denied and the judgment affirmed.

### FACTS

Shortly after midnight on June 6, 1998, Kellett's Oil, a gas station in Sikeston, Missouri, was robbed and the clerk working there was shot and subsequently died. Based primarily on information provided by Michael Hatcher ("Hatcher"), who admitted to taking part in the robbery, the State ultimately charged Defendant on November 24, 1999, with the following crimes: Murder in the first degree (§ 565.020), armed criminal action (§ 571.015), and robbery in the first degree (§ 569.020).

Summarized, Hatcher's at-trial testimony about Defendant's involvement was that near midnight on June 5, 1998, Defendant, Hatcher, Orlandis Farr ("Farr"), and Darius Nicholson ("Nicholson") agreed to rob Kellett's Oil. Hatcher, who was driving, parked in an alley. The four persons then donned caps and bandanas to cover their faces and walked to the gas station to carry out their planned robbery. During the robbery, Hatcher heard a gun shot and when he looked back, he saw Defendant and Nicholson running from the station. Hatcher also saw that the clerk had been shot and was lying on the floor. As the four robbery participants fled, they discarded their caps and bandanas.

Details about the investigative efforts of law enforcement officials and how they learned Defendant was implicated, included the following. At or near the scene, officers located a set of tire tracks, a blue bandana, a handgun, and ball caps in an alley. Also, a red bandana and a white t-shirt were found on a nearby street. It was learned that the bullet that killed the clerk came from the handgun found in the alley. Then in July 1998, police officers talked with suspects being held in Cape Girardeau concerning a robbery similar to that at Kellett's Oil. They gave officers information that led them to Hatcher and Nicholson.

When officers first talked to Hatcher, he denied involvement, but based on the information from the Cape Girardeau suspects, Hatcher was arrested and his automobile was seized. It was later learned that the tread pattern on at least one tire

---

1. All statutory references are to RSMo 2000 unless otherwise stated.

of Hatcher's car matched that taken from the tire tracks in the alley. Confronted with the tire evidence, Hatcher finally conceded he was in the vehicle the night of the robbery, but claimed he did not participate. Later, Hatcher told officers he would talk and identify the shooter if the prosecutor would give him a "deal" for ten years. After receiving an indication that he might receive that deal from the prosecutor, Hatcher told detectives that he, Nicholson, and "some guy from Malden" (who Hatcher was later able to identify as Farr from a high school yearbook picture) were involved in the robbery and murder. It was not until September 15, 1998, that Hatcher identified Defendant as one of the participants. His at-trial explanation for the delay was that he knew Defendant better than Farr and considered Defendant a friend and therefore was hesitant to name Defendant as a participant.

By his own admission, Hatcher had some difficulty telling the truth or relaying a complete story to investigators. During interviews with detectives and while testifying at his deposition and at preliminary hearings for Nicholson and Defendant, Hatcher lied or gave inconsistent statements about his realization that the others intended to commit the robbery, his level of involvement in the robbery, from where he obtained his bandana and who was wearing a bandana, his knowledge of Nicholson having a gun, and his whereabouts on that evening. In a letter he wrote the prosecutor from jail, Hatcher promised he would "do a better job testifying" and that he could "guarantee" a "definite conviction" if the prosecutor would promise him a "120 shock period" (referencing sentencing pursuant to § 559.115).

On November 24, 1999, the State charged Defendant, Farr, and Nicholson each with one count of murder in the first degree, armed criminal action, and robbery in the first degree.[2] The State pursued the armed criminal action and robbery in the first degree charges against Defendant and Farr as co-defendants, but elected to proceed against them on a murder in the second degree charge instead of murder in the first degree. The trial was held August 15–18, 2000. The jury acquitted Defendant and Farr of the murder in the second degree and armed criminal action charges, but convicted both of them on the robbery in the first degree charge. This appeal followed.

## DISCUSSION
### POINT I: DELAY IN FILING INFORMATION

Defendant's first point maintains the trial court erred when it refused to grant his motion to dismiss the information because of the State's delay in filing the charges. Defendant claims the State had learned from Hatcher that Defendant was allegedly involved in the robbery and murder as early as September 1998, but failed to charge Defendant with any crime until November 24, 1999. Defendant further claims that he was prejudiced by the delay because he was unable to establish an alibi defense due to the passage of time, unavailability of a witness, and dimming of memories.

A delay in filing an information or procuring an indictment may violate a defendant's constitutional due process rights. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). However, it is not the length of the delay that is dispositive, but whether

---

2. The State had previously filed charges against Nicholson based on his participation in these crimes. The State, however, dismissed those charges on September 28, 1999. At that time, neither Defendant nor Farr had been charged.

the accused suffered substantial prejudice due to the delay. *Id.* at 325. A short delay may be prejudicial in some circumstances whereas in others a long delay may not prove to be detrimental to an accused's constitutional rights. *Id.*

■ In considering if a delay in filing an information infringes on an accused's constitutional rights, the issue "is not whether [the] delay should have happened but rather whether [the] delay justifies the dismissal of charges against the [accused] under the due process clause of the Fifth and Fourteenth Amendments." *State v. Griffin*, 848 S.W.2d 464, 467[2] (Mo.banc 1993). "[T]he test for determining whether ... delay [in filing an information] requires the dismissal of charges is whether 1) the defendant was prejudiced by ... [the] delay which 2) was intended by the prosecution to gain a tactical advantage over the defendant." *Id.*

■ Before an information will be dismissed because of delay in its filing, Defendant must show both elements of the above test. *State v. Palmer*, 726 S.W.2d 447, 448 (Mo.App.1987). The "inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Delay in filing an information "is prejudicial if it impairs the defendant's ability to defend himself." *State v. Clark*, 859 S.W.2d 782, 786[2] (Mo.App.1993).

■ Here, Defendant claims that prejudice to him of constitutional dimension resulted from the delay in filing of charges because he and the people he was with during the early morning of June 6, 1998, "were simply unable to recall" the events of an "ordinary day 18 months prior" to his arrest. In his only illustration, Defendant claims "his then-girlfriend moved to Atlanta during the time between the robbery

and the filing of charges and was unavailable as a witness." Continuing, Defendant insists he "was prejudiced by the delay and ... resultant inability to present an alibi defense because had he been able to do so, the jury would have had something to compare to Hatcher's story and a reason to disbelieve it." He says the record is "clear that Hatcher was completely incapable of telling the same story twice[;]" that Hatcher "admitted to over twenty outright lies, 'misunderstandings[,]' failures to tell the 'whole truth[,]' and a 'not for real' lie." With that assertion made, Defendant concludes his prejudice argument by saying, "[i]t was ... clear that the *only* evidence the state had to connect [Defendant] to the robbery was Hatcher's testimony. If [Defendant] had been able to establish his whereabouts, the jury would have discounted Hatcher's story and acquitted [Defendant]."

■ Initially, we note that the prejudice Defendant must show to prevail on his first point has to be more than the real prospect of prejudice that normally attends any extended delay in criminal proceedings, i.e., that memories will dim, witnesses will become inaccessible, and evidence will be lost. *Clark*, 859 S.W.2d at 786. To have any chance of success, Defendant "must do more than speculate; he must indicate the nature of possible evidence which could be adduced." *Id.* Defendant has not met that burden here. Although he claims his former girlfriend had moved to Atlanta and was unavailable as a witness, he offers no clue as to why she was unavailable or what her testimony might have been. Lack of presence in the jurisdiction does not make a witness unavailable. *State v. Robinson*, 696 S.W.2d 826, 831 (Mo.App.1985). To meet his burden, Defendant needed to show that the witness was indeed unavailable and to make an offer of proof regarding what her

testimony would have been. *Clark*, 859 S.W.2d at 786; *Robinson*, 696 S.W.2d at 831. Defendant, however, made no such effort.

As for the dimming of his own memory, Defendant testified he could not recall his whereabouts on the night of the robbery. He also testified, however, that he knew he would not have been with Hatcher on that night because they did not get along. Defendant explained his dislike for Hatcher stemmed from the fact that he believed Hatcher had sexual intercourse with Defendant's girlfriend. From this we discern that Defendant could remember associated events and through such testimony was able to present exculpatory evidence, i.e., evidence from which the jury could infer that whenever the crime was committed, Defendant was not a participant because he would not associate with Hatcher.

In addition, the mother of Defendant's girlfriend testified about Defendant's whereabouts on the night of the robbery. She remembered a day in June 1998 when there was yellow tape around Kellett's Oil. She testified that Defendant stayed at her house the night before and he was there on that morning and had taken her daughter (Defendant's then girlfriend) to work that morning sometime between 5 and 6 a.m. Therefore, the memory of at least one of Defendant's witnesses had not dimmed, and the testimony of the mother of Defendant's then-girlfriend may have also provided Defendant with an alibi.[3]

Further, Defendant's testimony revealed there was not a fifteen-month delay from the time law enforcement officers were told of Defendant's alleged participation in the crime and Defendant learning that officers viewed him as a suspect. Specifically, Defendant testified that sometime in March or April 1999, he was approached by the investigator of the public defender representing Nicholson. Based on the investigator's question, Defendant became aware of the importance of knowing his whereabouts on June 6, 1998. Although Defendant was not charged until November 1999, he was aware that an investigation was being conducted, as well as the fact that Hatcher had named him as part of that investigation, much earlier than November 1999.

As to Defendant's argument that Michael Hatcher was not credible and could not tell a consistent story, the jury was fully aware of Hatcher's history of untruthfulness, half-truths, and deception. For instance, at trial, Defendant's counsel got Hatcher to admit that he lied to detectives during the early stages of the investigation; he lied under oath during an October 21, 1998, preliminary hearing; he wrote to the Scott County prosecutor and offered to "fix the problems" that he might have caused; and he promised the prosecutor he "could do a lot better" the next time he testified. Defendant's argument that if he could have shown his whereabouts the night of the crime, the jury would have discounted Hatcher's story and acquitted Defendant, fails for two reasons. First, it is speculative, and second, it fails to recognize that the reliability, credibility, and weight of Hatcher's testimony was for the jury to decide. *State v. Sumowski*, 794 S.W.2d 643, 645[3] (Mo.banc 1990); *State v. Idlebird*, 896 S.W.2d 656, 661[6] (Mo.App.1995). The defense presented ample evidence that Hatcher had not always told the truth to law officers; the jury was, therefore, free to consider that evidence in deciding if Hatcher was truth-

---

3. We agree that the effectiveness of this witness' alibi testimony was lessened by her inability to say Defendant was definitely at her house during the established time of the robbery.

ful when he testified about Defendant's involvement in the crime.

In summary, Defendant simply has not shown he suffered prejudice to the extent that his constitutional due process rights were infringed because of the State's delay in filing the information. Accordingly, Point I is denied.[4]

### POINT II: LACK OF SPEEDY TRIAL

Defendant's second point on appeal is that the trial court erred in refusing to dismiss the charges because he was denied a speedy trial. Defendant filed his motion for speedy trial on January 6, 2000. Once Defendant filed his motion for speedy trial, the trial court was required to "set the case for trial as soon as reasonably possible thereafter." § 545.780. "Neither the failure to comply with this section nor the state's failure to prosecute shall be grounds for the dismissal of the . . . information unless the court also finds that the defendant has been denied his constitutional right to a speedy trial." *Id.*

■ " 'The right to a speedy trial guarantees to a criminal defendant that the state will move fast enough to assure the defendant of the early and proper disposition of the charges against him.' " *State v. Williams,* 34 S.W.3d 440, 446 (Mo. App.2001) (citation omitted); *see also Marion,* 404 U.S. at 313. Orderly expedition of the case, and not mere speed, is the essential requirement behind a speedy trial. *Marion,* 404 U.S. at 313. The protection of the right to a speedy trial attaches at the point of a formal indictment or arrest. *State v. Fleer,* 851 S.W.2d 582,

596[37] (Mo.App.1993). Deprivation of the right to a speedy trial is not considered *per se* prejudicial to Defendant. *Barker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972).

■ In analyzing whether an accused's right to a speedy trial has been violated, appellate courts balance the four factors listed in *Barker,* i.e., "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant." *State v. Bolin,* 643 S.W.2d 806, 813 (Mo.banc 1983).

■ In this instance, there was an eight and one-half month delay in the trial. A delay of that length is presumptively prejudicial; consequently, no further discussion of the first factor is necessary. *State v. Farris,* 877 S.W.2d 657, 660 (Mo.App. 1994).

As to the second factor (reason for the delay), we note that this case was originally set for trial for June 2000, but on April 19, 2000, was continued to August 2000. The State makes no claim that the delay was caused by unavailability of witnesses (which would not have been assessed against the State, *State v. Raine,* 829 S.W.2d 506, 512 (Mo.App.1992)), but rather claims that the reasons for the delay were related to docket issues and court scheduling. Such reasons for delay are weighed against the State, but not heavily when, as here, there is no evidence that the delay was deliberately intended to hamper the defense. *Id.* We find none of the delay attributable to Defendant.

---

4. We have thoroughly reviewed the record regarding the second prong of the test for prejudicial delay and find nothing to indicate that the State willfully intended to cause delay or that the delay was purposeful or aimed at creating a tactical advantage for the prosecution. Because there is no evidence that a "tactical advantage was sought or achieved"

by the State, Defendant's first point fails for this additional reason. *State v. Scott,* 621 S.W.2d 915, 918 (Mo.1981). Moreover, we note that the State's prosecution of Defendant after " 'investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.' " *Id.* at 917 (citation omitted).

Regarding the third factor, i.e., Defendant's assertion of his right to a speedy trial, we note he made his request forty-three days after being charged. Although this was not immediate, neither did Defendant wait several months to assert his right, which has been found to weigh against an accused. *Fleer*, 851 S.W.2d at 597. We weight this factor favorably to Defendant. *State v. Holmes*, 643 S.W.2d 282, 288 (Mo.App.1982).

 The fourth and final factor to be considered is whether Defendant was prejudiced by the delay in trial. Missouri courts have considered this the most important factor of the four. *Farris*, 877 S.W.2d at 663. Analysis of this factor is based on three components: "(1) prevention of oppressive pretrial imprisonment; (2) minimization of the defendant's anxiety and concern; and (3) limitation of the possible impairment of the defense." *State v. Davis*, 903 S.W.2d 930, 937[29] (Mo.App. 1995). The last of the three components is considered most vital to the analysis. *Id.*

Defendant was imprisoned for ten months prior to trial. In his brief, Defendant does not assert that he suffered any anxiety or concern. However, Defendant does assert that he was impaired in his defense. Similar to arguments made by Defendant on his first point relied on, Defendant claims that he was prejudiced in his ability to establish an alibi defense, his memories and the memories of his witnesses dimmed due to the lapse of time, and witnesses became inaccessible.

As Defendant's claims of prejudice are the same, our analysis and conclusion are the same as discussed in Point I. Defendant failed to meet his burden to show prejudice occurred due to any delay. He was able to present evidence that may have related to an alibi defense, his testimony showed he had memories of why his whereabouts would not have included be-

ing with Hatcher on the night in question, and he neither showed his girlfriend was unavailable as a witness due to her move to Atlanta nor made an offer of proof regarding her expected testimony. Considering no factor is weighed heavily against the State and considering the fourth factor (which is most important) is weighed against Defendant, we find no violation of his right to a speedy trial. Point II is denied.

In his third point on appeal, Defendant claims the trial court abused its discretion and committed reversible error in overruling Defendant's motion for mistrial. During cross-examination of Detective Croker by co-defendant Farr's counsel, Croker was asked questions as to why he did not act more quickly upon information given to him by Hatcher about Defendant and Farr. During his testimony, the following exchange occurred:

"Q. (by Farr's counsel): Now, after you had gathered this information and gotten the name of Orlandis Farr, you told us that you done some investigation as far as Orlandis Farr was concerned, right?

"A. (by Croker): Yes, ma'am.

"Q. But you didn't do any investigation as far as Michael Bell was concerned, right?

"A. Well, there was investigations, but they were more—Michael Bell would have been fairly easy to locate.

"Q. But you never located him?

"A. Well, I seen him, but Michael Bell has never been a talker, so I thought that would be a waste of time."

Later, under recross-examination by Defendant's counsel, the following exchange occurred:

"Q. (by Defendant's counsel): Okay. Now, you said you couldn't find Mister Farr, but a little while ago you said

Mister Bell was easy to find. You could have picked him up without a warrant, couldn't you?

"A. (by Croker): On a 20 hour hold, yes, sir.

"Q. And you could have picked him up—you had asked for warrants but you didn't pick him up?

"A. That's correct.

"Q. And he wasn't arrested for over a year? Correct?

"A. That's correct.

"Q. It's because you knew you had a bad case, right?"

At this question, the prosecutor objected and the objection was sustained.

Later, on redirect of Croker by the prosecutor, the following occurred:

"Q. (Prosecutor): You were asked about not attempting to talk to Michael Bell. Is there a reason why you didn't try to talk to Michael Bell?

"A. (by Croker): He generally don't talk to us."

Finally, defense counsel again asked Croker, "[t]he fact is, you were concerned that you had a bad case, correct?" Thereon, the prosecutor objected and a bench conference took place outside the hearing of the jury during which Defendant's counsel contended that the State had opened the door and that his line of questioning of Croker should have been allowed. The trial court agreed with the State that it was improper for Defendant's counsel to ask questions about or refer to "the bad case thing." The trial court, however, then expressed concern that Croker's responses that Defendant generally did not talk to the police could imply that Defendant was "committing all kinds of crimes," and that the responses came "close to suggesting uncharged conduct."

Defendant then asked the trial court to advise the jury that the responses should be stricken and for the jury to disregard them. The court directed the prosecutor not to "delve into the issue any further," and indicated that it would instruct the jury to disregard any comments from Croker "about not talking to [Defendant] because he generally did not talk to [the police]." Defendant then moved for a mistrial, which was immediately denied. The court then instructed the jury as it had said it would.

Initially, we note Defendant failed to make a timely objection to the comments about which he now complains. "[T]o preserve an allegation of error on appeal there must be a proper objection and ... an adverse ruling." *State v. Perry*, 954 S.W.2d 554, 559[2] (Mo.App.1997). "Failure to object at the earliest opportunity to the admission of evidence ... constitutes a waiver of the claim." *State v. Cosby*, 976 S.W.2d 464, 467[4] (Mo.App. 1998). Thus, our review of this point is confined to plain error and we will grant relief "only when the error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected." *State v. McCracken*, 948 S.W.2d 710, 713[2] (Mo.App.1997); Rule 30.20.

Had this claim of error been preserved, we would analyze the prejudicial effect of Croker's comments using five factors. *State v. Smith*, 934 S.W.2d 318, 320 (Mo.App.1996). The factors are: "(1) whether the statement was, in fact, voluntary and unresponsive ... or whether the prosecution 'deliberately attempted to elicit' the comments; (2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; (3) whether the remarks were vague and indefinite, or whether they made specific reference to

crimes committed by the accused; (4) whether the court promptly sustained defense counsel's objection to the statement, . . . and instructed the jury to disregard the volunteered statement; and (5) whether in view of the other evidence presented and the strength of the state's case, it appeared that the comment 'played a decisive role in the determination of guilt.' " *Id.* (quoting *State v. Silas,* 885 S.W.2d 716, 720 (Mo.App.1994)).

■ This record does not contain evidence that supports a finding of the existence of any one of the five factors. First, there is no evidence the State made a deliberate effort to elicit from Croker the subject remark, i.e., "[Defendant] has never been a talker." The initial comment by Croker came in response to a question from co-defendant Farr's lawyer. The other similar remark by Croker—to which Defendant did not timely object—was elicited in an apparent attempt to explain away the "bad case" remark that co-defendant Farr's lawyer had injected in the case during cross-examination.

Second, there is no evidence that the prosecution emphasized the statements in any way. In fact, defense counsel may have highlighted it by twice making reference to the State's alleged "bad case," including once after the State's objection was sustained.

As to the third factor, the statements may have left an impression that Defendant had committed other crimes or had other run-ins with law enforcement, but the statements themselves were vague and indefinite. We are confirmed in that belief by the fact that defense counsel apparently did not initially recognize the "non-talker" remarks as references to Defendant's prior

crimes or bad conduct, thus explaining why he did not timely object and seek relief.

■ The fourth factor is not implicated here since Defendant never timely objected to Croker's remarks. Moreover, despite the lack of timely objection, the court gave Defendant relief by instructing the jury to disregard Croker's remarks. "Ordinarily a trial court cures errors in matters presented to the jury by instructing the jury to disregard the offending matter." *State v. White,* 856 S.W.2d 917, 920[3] (Mo.App.1993).

As to the fifth factor, Croker's reference to Defendant as a non-talker could not have had a decisive role in the determination of Defendant's guilt. This follows because Defendant himself put evidence of his prior convictions and bad conduct before the jury. He first did this during voir dire by telling the jury he had a prior conviction. Then, as Defendant testified he told the jury he had been "locked up" in 1997, that he was in his "probation office" when arrested for this crime, and he had previously served time in the department of corrections.

As there is no evidence to support the "prejudice" factors, Defendant's point fails. Defendant has not demonstrated any error, much less a manifest injustice or miscarriage of justice from the trial court's refusal to grant a mistrial because of Croker's responses as to why he had not interviewed Defendant. Defendant's third point is denied.[5]

■ Defendant's fourth and final point is that the trial court abused its discretion by refusing to allow Defendant

---

5. The point also fails because a trial court's ruling that is adverse to an accused regarding unrelated misconduct or other crimes will not lead to reversal if such evidence is merely cumulative. *State v. Alexander,* 875 S.W.2d 924, 931[11] (Mo.App.1994); *State v. Teal,* 624 S.W.2d 122, 126 (Mo.App.1981).

to present evidence on why the State dismissed charges against Nicholson. Defendant subpoenaed Judge Fred Copeland, who had presided over Nicholson's case before it was dismissed on September 28, 1999. During the pre-trial conference, the State filed a motion to quash the subpoena issued to Judge Copeland, and the trial court granted that motion. A trial court is accorded broad discretion regarding its rulings on evidentiary issues and the admissibility of evidence. *State v. Hayes*, 15 S.W.3d 779, 785[8] (Mo.App.2000). We will disturb the trial court's ruling only upon a clear showing of an abuse of discretion. *Id.* at 785[9].

Defendant claims that Judge Copeland's testimony would have been relevant and provided the jury with evidence that Defendant was not charged for fifteen months, that the State "didn't have anything and . . . still have nothing" on which to base their case against Defendant, and that would explain why memories would be dimmed. Defendant also argues that the testimony was relevant and necessary to the establishment of a defense to the charges and to explain Croker's testimony as to why he did not interview Defendant. Further, Defendant asserts that the evidence was relevant to and would bolster his pre-indictment delay claim by showing that if the State had a good case against Defendant, he would have been indicted sooner. The State argues that the charges were dropped against Nicholson because of the new information about additional participants. The State further claims that the case against Nicholson was dropped so that it could be refiled in Scott County against Nicholson, Defendant, and Farr. This in fact took place on November 24, 1999.

The disposition of someone else's case is considered irrelevant to the issue of whether a defendant is guilty or innocent. *State v. Douglas*, 917 S.W.2d 628, 631[7] (Mo.App.1996). Evidence is only admissible if it is relevant. *State v. Weaver*, 912 S.W.2d 499, 510[13] (Mo.banc 1995). Defendant has not shown the evidence was relevant; that it logically tended "to prove a fact in issue or corroborate relevant evidence that bears on the principal issue." *Id.*

Defendant was not prejudiced by the exclusion of this evidence. The trial court did not abuse its discretion by refusing to allow evidence from Nicholson's dismissal hearing. Defendant's fourth point is denied.

The judgment is affirmed.

PARRISH, J., concurs.

RAHMEYER, J., concurs.